**No. 25-5057**

# In the United States Court of Appeals for the Ninth Circuit

DAMIEN UHL,
and those similarly situated,
*Plaintiff-Appellee,*

v.

ROBLOX CORPORATION, a Delaware corporation,
*Defendant-Appellant.*

On Appeal from the United States District Court
for the Southern District of California
Case No. 3:23-cv-01940-TWR-BLM (The Hon. Todd W. Robinson)

## PLAINTIFF-APPELLEE'S ANSWERING BRIEF

ANNE KORS*
SONALI MEHTA
GUPTA WESSLER LLP
2001 K Street NW
Suite 850 North
Washington, DC 20006
(202) 888-1741

JENNIFER D. BENNETT
HANNAH M. KIESCHNICK
GUPTA WESSLER LLP
235 Montgomery Street
Suite 629
San Francisco, CA 94104
(415)-573-0336
*jennifer@guptawessler.com*

ROBERT S. SIKO
ANDREWS & HIGGINS
4701 Von Karman Avenue
Suite 300
Newport Beach, CA 92660
(949) 748-1000

D. PATRICK HUYETT
ANAPOL WEISS
130 North 18th Street
Suite 1600
Philadelphia, PA 19103
(215) 608-9645

(additional counsel on inside cover)

February 3, 2026                    *Counsel for Plaintiff-Appellee*

ALEXANDRA WALSH
ANAPOL WEISS
14 Ridge Square, NW
3rd Floor
Washington, DC 20016
(771) 224-8065

*Admitted only to California
Bar; practice limited to matters
before federal courts

*Counsel for Plaintiff-Appellee*

**TABLE OF CONTENTS**

Table of authorities .................................................................................. iii

Introduction ............................................................................................. 1

Statement of the case ............................................................................... 2

    I.     Factual background ................................................................. 2

          A.     The Roblox platform .................................................. 2

          B.     Mr. Uhl's daughter's experience. ............................... 6

    II.    Procedural history ................................................................. 7

Standard of review ................................................................................. 13

Summary of argument ............................................................................ 14

Argument ............................................................................................... 18

    I.     Roblox waived its claimed right to arbitrate. ......................... 18

          A.     Roblox has known of its claimed right to arbitrate since Mr. Uhl filed his complaint. ....................... 19

          B.     Roblox acted inconsistently with a right to compel arbitration ................................................................ 25

    II.    Roblox did not prove the existence of an agreement to arbitrate between the company and Mr. Uhl .................................................. 33

          A.     Roblox does not provide Robux purchasers reasonably conspicuous notice of its terms or that they will be bound to those terms ........................................................... 34

          B.     Roblox's terms would not lead a reasonable consumer to believe that they bind those who do not play Roblox.............. 44

          C.     Roblox did not demonstrate that Mr. Uhl assented to its terms ............................................................................ 45

i

1. Roblox did not demonstrate by a preponderance of the evidence that Mr. Uhl made the in-game purchases on his daughter's account ..............................46

2. Mr. Uhl's daughter did not serve as his agent, let alone bind him to Roblox's terms...................................52

Conclusion .......................................................................................................54

# TABLE OF AUTHORITIES

## Cases

*Adolph v. Coastal Auto Sales, Inc.*,
110 Cal. Rptr. 3d 104 (Cal. Ct. App. 2010) ........................................................ 30

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ...................................................................................................50

*Armstrong v. Michaels Stores, Inc.*,
59 F.4th 1011 (9th Cir. 2023) ...........................................................................25, 28

*Berman v. Freedom Financial Network, LLC*,
30 F.4th 849 (9th Cir. 2022)..............................................................34, 41, 42, 43

*Brown v. Dillard's, Inc.*,
430 F.3d 1004 (9th. Cir. 2005) ............................................................................ 13

*Caccuri v. Sony Interactive Entertainment LLC*,
735 F. Supp. 3d 1139 (N.D. Cal. 2024)..............................................................23

*Chabolla v. ClassPass Inc.*,
129 F.4th 1147 (9th Cir. 2025) ...................................................................... 34, 35

*Courtright v. Epic Games, Inc.*,
766 F. Supp. 3d 873 (W.D. Mo. 2025)..............................................................54

*Doe v. Massage Envy Franchising, LLC*,
87 Cal. App. 5th 23 (2022)........................................................................... 37, 43

*Domer v. Menard, Inc.*,
116 F.4th 686 (7th Cir. 2024)...............................................................................39

*Doyle v. UBS Financial Services, Inc.*,
144 F.4th 122 (2d Cir. 2025)................................................................................26

*Epic Games, Inc. v. Apple Inc.*,
161 F.4th 1162 (9th Cir. 2025).............................................................................52

*FBC Mortgage, LLC v. Skarg*,
699 F. Supp. 3d 837 (N.D. Cal. 2023)...............................................................23

*Fox v. Experian Information Solutions, Inc.*,
  718 F. Supp. 3d 1231 (E.D. Cal. 2024) ....................................................23

*Garcia v. KND Development 52, LLC*,
  58 Cal. App. 5th 736 (2020) ....................................................................53

*Gile v. Dolgen California, LLC*,
  2022 WL 17248087 (9th Cir. 2022) ..........................................................29

*Global Security & Communications, Inc. v. AT&T*,
  191 F.3d 460 (9th Cir. 1999) ....................................................................28

*Godun v. JustAnswer LLC*,
  135 F.4th 699 (9th Cir. 2025) ..............................................................40, 43

*Gray Holdco, Inc. v. Cassady*,
  654 F.3d 444 (3d Cir. 2011) .....................................................................29

*Hansen v. LMB Mortgage Services, Inc.*,
  1 F.4th 667 (9th Cir. 2021) ..................................................................49, 51

*Heidbreder v. Epic Games, Inc.*,
  438 F. Supp. 3d 591 (E.D.N.C. 2020) .......................................................54

*Herzog v. Superior Court*,
  101 Cal. App. 5th 1280 (2024) .................................................................37

*Hill v. Xerox Business Services, LLC*,
  59 F.4th 457 (9th Cir. 2023) ........................................................13, 18, 21

*Hoffman v. Young*,
  13 Cal. 5th 1257 (2022) ...........................................................................53

*Hooper v. Advance America, Cash Advance Centers of Missouri, Inc.*,
  589 F.3d 917 (8th Cir. 2009) ....................................................................26

*Houghton v. Polychain Alchemy, LLC*,
  2025 WL 2965204 (9th Cir. 2025) .............................................. 21, 22, 25

*Howard v. Ferrellgas Partners, L.P.*,
  2013 WL 4648273 (10th Cir. 2013) ...........................................................51

*In re Cellular 101, Inc.*,
    539 F.3d 1150 (9th Cir. 2008)................................................................. 31

*In re Pawn America Consumer Data Breach Litigation*,
    108 F.4th 610 (8th Cir. 2024) ............................................................ 31

*Joca-Roca Real Estate, LLC v. Brennan*,
    772 F.3d 945 (1st Cir. 2014) ................................................................29

*Johnson v. Activision Blizzard, Inc.*,
    2025 WL 864824 (E.D. Ark. 2025) ...................................................54

*Kelly v. Public Utility District No. 2 of Grant County*,
    552 F. App'x 663 (9th Cir. 2014) .......................................................29

*Kloosterman v. Metropolitan Hospital*,
    153 F.4th 501 (6th Cir. 2025).................................................26, 27, 30

*Knapke v. PeopleConnect, Inc.*,
    38 F.4th 824 (9th Cir. 2022) ...................................................13, 21, 22

*Lake Communications, Inc. v. ICC Corp.*,
    738 F.2d 1473 (9th Cir. 1984)............................................................. 27

*Martin v. Yasuda*,
    829 F.3d 1118 (9th Cir. 2016)............................................. 12, 18, 25, 27

*Messina v. North Central Distributing, Inc.*,
    821 F.3d 1047 (8th Cir. 2016)............................................................29

*Mitsubishi Motors Corp. v. Soler Chrystler-Plymouth, Inc.*,
    473 U.S. 614 (1985) ........................................................................ 27

*Morgan v. Sundance, Inc.*,
    596 U.S. 411 (2022) ...........................................................25, 26, 28, 31

*Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*,
    460 U.S. 1 (1983) ..............................................................................12

*Newirth v. Aegis Senior Communities, LLC*,
    931 F.3d 935 (9th Cir. 2019)............................................. 15, 25, 28, 31

v

*Nguyen v. Barnes & Noble Inc.*,
    763 F.3d 1171 (9th Cir. 2014) ...................................................... 39, 44, 45

*Nicosia v. Amazon.com, Inc.*,
    834 F.3d 220 (2d Cir. 2016) ...................................................................... 40

*Norcia v. Samsung Telecommunications America, LLC*,
    845 F.3d 1279 (9th Cir. 2017) ............................................................ 33, 46

*Oswald Machine & Equipment, Inc. v. Yip*,
    10 Cal. App. 4th 1238 (1992) ................................................................. 53

*Parker v. Kearney School District*,
    130 F.4th 649 (8th Cir. 2025) ............................................................ 21, 23

*Rogers v. Roseville SH, LLC*,
    75 Cal. App. 5th 1065 (2022) ................................................................ 54

*Saeedy v. Microsoft Corp.*,
    757 F. Supp. 3d 1172 (W.D. Wash. 2024) ........................................... 23

*Sellers v. JustAnswer LLC*,
    73 Cal. App. 5th 444 (2021) ..................................................41, 43, 45, 54

*Sgouros v. TransUnion Corp.*,
    817 F.3d 1029 (7th Cir. 2016) ............................................................ 36, 38

*Simula, Inc. v. Autoliv, Inc.*,
    175 F.3d 716 (9th Cir. 1999) .................................................................. 13

*Smith v. GC Services Limited Partnership*,
    907 F.3d 495 (7th Cir. 2018) ......................................................... 21, 22, 23

*Southern California Gas Co. v. City of Santa Ana*,
    336 F.3d 885 (9th Cir. 2003) ................................................................. 49

*Specht v. Netscape Communications Corp.*,
    306 F.3d 17 (2d Cir. 2002) ..................................................................... 34

*St. Mary's Medical Center of Evansville, Inc. v. Disco Aluminum Products Co.*,
    969 F.2d 585 (7th Cir. 1992) ................................................................. 26

*Starke v. SquareTrade, Inc.*,
    913 F.3d 279 (2d Cir. 2019)..................................................................36

*Stolt-Nielsen S.A. v. AnimalFeeds International Corp.*,
    559 U.S. 662 (2010) ...........................................................................33

*Support Community, Inc. v. MPH International, LLC*,
    2025 WL 547380 (9th Cir. 2025)..........................................................29

*Three Valleys Municipal Water District v. E.F. Hutton & Co., Inc.*,
    925 F.2d 1136 (9th Cir. 1991).............................................................50

*United States v. Dibble*,
    429 F.2d 598 (9th Cir. 1970) ..............................................................49

*United States v. Olano*,
    507 U.S. 725 (1993) ........................................................................... 31

*Van Ness Townhouses v. Mar Industries Corp.*,
    862 F.2d 754 (9th Cir. 1988)...............................................................12

*Volt Information Sciences, Inc. v. Board of Trustees of
    Leland Stanford Junior University*,
    489 U.S. 468 (1989)............................................................................33

*White v. Samsung Electronics America, Inc.*,
    61 F.4th 334 (3d Cir. 2023)................................................. 21, 23, 26, 31

*Wilson v. Huuuge, Inc.*,
    944 F.3d 1212 (9th Cir. 2019).............................................................52

## Statutes

9 U.S.C. § 3 ................................................................................................ 30

## Rules

Fed. R. Civ. P. 8............................................................................................ 31

Fed. R. Civ. P. 37.........................................................................................48

## Other Authorities

Good-Faith Bargaining, *Black's Law Dictionary* (2d ed. 1910).................................... 30

Roblox, *Internet Archive* (2017),
https://web.archive.org/web/20170601045444 ..................................................... 3

## INTRODUCTION

Nearly two-thirds of American kids play Roblox. Roblox is a virtual universe, pitched to parents as a safe place for children to play online. It's also a billion-dollar company: Kids who play Roblox spend money on virtual games, virtual clothing, even virtual hairdos for their online avatars. And although the company knows that its platform is not actually safe for kids, it continues to promise parents otherwise. Damien Uhl is one of those parents. He allowed his daughter to play Roblox, because Roblox promised to keep her safe. But the company didn't stop an adult predator from targeting her.

After Mr. Uhl first filed this lawsuit, Roblox spent nearly a year litigating in court. But when the district court declined to dismiss the lawsuit with prejudice, Roblox decided that, actually, it would rather arbitrate the claims and moved to compel arbitration. The district court rejected this gambit. This Court should do the same.

First, the company waived any right it might have had to compel arbitration. Parties may not litigate in court, only to turn around and compel arbitration if the court does not do what they wish. Second, Mr. Uhl never agreed to arbitrate with Roblox in the first place. Roblox claims to have bound Mr. Uhl to its terms when he purchased Robux—the company's virtual currency—on a mobile phone app or website. But Mr. Uhl never did that. His daughter did.

1

And, in any event, Roblox does not form a contract with those who buy Robux. To bind a purchaser to an online contract, an internet company must at least provide reasonably conspicuous notice that it's doing so. Roblox's app tells purchasers that by clicking a button, they are paying for their purchase—and, perhaps, agreeing to *someone else's* terms—not contracting with Roblox. That's not reasonably conspicuous notice. That's no notice at all.

## STATEMENT OF THE CASE

### I. Factual Background

### A. The Roblox Platform

**1.** Roblox is a massive online gaming site targeted at kids. 3-ER-248, 255. The platform is a user-generated virtual world, in which users can explore, play games, and talk directly with other users. 3-ER-252. That virtual world is popular: It hosts 36.2 million daily visitors, and nearly 7 million people contribute to building it—from designing virtual experiences to selling virtual clothing. *Id.* The platform is especially popular with children. Roblox boasts that two-thirds of American kids between the ages of 9 and 12 are on its platform. 3-ER-248.[1]

That's no accident. The company markets its platform as the "#1 gaming site for kids and teens." 3-ER-255. Roblox, the company says, is the "best place" for kids

---

[1] Unless otherwise noted, all internal quotation marks, citations, and alterations have been omitted from quotations throughout this brief. References to Dkt. are to the district court docket.

to "Imagine with Friends." Roblox, *Internet Archive* (2017), https://web.archive.org/web/20170601045444/https://www.roblox.com. "Every day, virtual explorers come to ROBLOX to create adventures, play games, role play, and learn with their friends in a family-friendly, immersive, 3D environment." *Id.*; *see* 3-ER-255.

**2.** The "loyalty of millions of children" has earned Roblox billions of dollars. 3-ER-247–48. Although it does not cost anything to create a Roblox account, Roblox players can purchase virtual games, virtual clothing, virtual tools, even virtual hairstyles. 3-ER-252, 261. But to do so, they must use the platform's virtual currency, Robux. 3-ER-247. And Roblox sells that currency for real-world dollars. 3-ER-247, 252–53. The company also takes a percentage of every content sale made on the platform: If a user buys access to a virtual experience or a special outfit from another user, Roblox takes 30%. 3-ER-253. And, of course, when Roblox sells its own content, it takes 100%. *Id.*

Because their impulse control is not fully developed, kids not only end up "hooked" on the game, unable to step away, they are also particularly susceptible to impulse purchases. 3-ER-254–55, 261–63. Roblox knows this and has designed its platform to make it as easy as possible for kids to spend money on the platform. When users make a purchase, the payment information used is stored on their account. 3-ER-253. So even if a parent only gives their child permission to use their

3

credit card for a single purchase, the child can make additional purchases that will be automatically charged to that card. 3-ER-252–53. Kids can also "subscribe to receive Robux on a recurring basis," with a monthly charge that, again, is automatically charged to the payment method stored on the user's account. *Id.*

And because purchases are denominated in Roblox's made-up currency, it's difficult for kids to even know how much they're spending. 3-ER-259–60. For example, "Beautiful Hair for Beautiful Space People" sells for about 6,062 Robux. 3-ER-261–62. That's more than thirty dollars for a virtual hairdo, yet over 40,000 players have bought it. *Id.* A "hat accessory" can cost $600 in real-world currency. 3-ER-260. "[T]he point" of denominating in-game purchases in Robux is to obscure these prices, making it even easier for children—who "often do not yet understand the value of money"—to spend money without realizing the real-world impact. 3-ER-260–61.

Kids can easily spend hundreds, sometimes thousands, of dollars—what one parenting site called "casino-level spending sprees"—"without their parents' knowledge." 3-ER-259. That's what makes Roblox's "free" game a billion-dollar product.

**3.** Of course, to successfully get kids on the platform, Roblox has to convince parents that it is safe. So Roblox advertises that its platform is "safe" and "family-friendly." 3-ER-255–56. It publishes a Parent's Guide that not only reassures parents

that the platform is a "safe, moderated place to … play," but tells parents about specific features that make it so. 3-ER-255. Roblox promises that an "around the clock moderation team" reviews "all uploaded images, video, and audio files … for appropriate content before" the content is "allowed on the site." *Id.* It tells parents that it has a "state-of-the-art filtering system that actively filters for inappropriate chat everywhere on the site and in-game." *Id.* It says that "an automated detection feature" "ensure[s] that all players are wearing appropriate attire." *Id.* And it claims to "protect [its] players' safety by proactively filtering inappropriate content and acting against anyone who is in violation of [its] Rules of Conduct." 3-ER-266.

Roblox promises extra protection for players under thirteen. It tells parents that it "prevent[s]" kids from "from sharing personal info via chat messages or in-game." 3-ER-266. And, it says, the company "automatically enforce[es] more restricted settings," blocking messaging with any users who have not been "accepted as friends on Roblox." 3-ER-256. According to Roblox, it is "extremely difficult for strangers on Roblox to contact" kids under thirteen. *Id.* Over and over, the company tells parents that unlike most places online, Roblox is a "safe space" for kids. 3-ER-256, 297.

But Roblox is well aware that its promises are not true. 3-ER-249. While Roblox advertises its platform as "family friendly," the company knows that there are adults on the platform who "groom[], sext[], and otherwise exploit[] young

5

users." 3-ER-249. Although Roblox promises that it shields children from "inappropriate content," 3-ER-257, they "encounter virtual strip clubs, simulated sexual intercourse, masturbation, and use of sex toys." 3-ER-249. For example, the platform hosts so-called "condo games," virtual rooms in which users engage in virtual sex—and where predators try to chat with and solicit photos from kids. 3-ER-257. One condo-game developer told a reporter, "[i]f horny little kids get catfished by pedophiles on condos then sorry this is becoming natural selection." 3-ER-257–58.

And despite Roblox's assurances, strangers easily—and routinely—message kids. 2-ER-91; 3-ER-249, 257–58. "Almost all safeguards to prevent strangers from contacting and grooming children on Roblox are disabled by default." 3-ER-257. And Roblox's claim that nobody can message children under thirteen except their friends is just false: Once a user enters a Roblox "experience"—most of which are not age-gated—anyone else in that experience can message them. 3-ER-257.

### B. Mr. Uhl's daughter's experience.

When Damien Uhl discovered that his kids were playing a game called Roblox, he was concerned about their "privacy and safety." 3-ER-265. So he investigated the platform and discovered Roblox's promises of a "safe" platform, where moderators block inappropriate content and kids under thirteen can only be

6

messaged by their friends. 3-ER-265–66. Relying on these promises, Mr. Uhl allowed his children "to continue playing the game." 3-ER-265.

But Mr. Uhl eventually discovered what many other parents have discovered: Roblox was not, in fact, safe for children. After his kids had been using Roblox for years, Mr. Uhl's daughter told him of a "friend she had made on Roblox." 3-ER-267. That "friend"—who claimed to be the same age as his daughter—turned out to be an adult woman, who had been sending his daughter "messages of a sexual nature." *Id.* Mr. Uhl immediately prohibited his kids from playing Roblox any more. 3-ER-204.

## II.    Procedural History

This lawsuit was initially filed on August 7, 2023, in state court by parents who, like Mr. Uhl, had been misled by Roblox into allowing their kids to play a game that Roblox knew was unsafe. Dkt. 1-2, at 1. Mr. Uhl joined as a named plaintiff a couple months later. SER-4.[2] Roblox then removed the case to federal court and successfully opposed a motion to remand. 3-ER-328, 330.

***Roblox's motion to dismiss.*** Roblox did not then move to compel arbitration. It moved to dismiss the complaint "with prejudice" on the merits. 3-ER-321. Among other things, the company argued that the district court should

---

[2] Mr. Uhl is now the sole named plaintiff. For ease of reading, this brief omits prior plaintiffs except where relevant.

hold that Section 230 or the First Amendment barred all the claims—a ruling it could not only wield against Mr. Uhl, but use in its efforts to defend against similar claims brought by other parents. 3-ER-303–08. The district court declined to dismiss the claims with prejudice, holding only that the complaint should be amended to plead its assertions about Roblox's misrepresentations with greater particularity. SER-38–52. Mr. Uhl amended his claims in accordance with the district court's instructions. 3-ER-246–82.

**Roblox's initial motion to compel arbitration.** Only once the district court rejected Roblox's effort to dismiss the entire complaint with prejudice did the company seek, for the first time, to compel arbitration. 3-ER-206–34. Roblox filed its first motion to compel on August 28, 2024—almost a year after Mr. Uhl filed his claims. *Id.* That motion argued that the same claims that Roblox had asked the district court to decide in its motion to dismiss must actually be resolved by an arbitrator. *Id.*

Roblox contended that Mr. Uhl agreed to arbitrate by purchasing Robux on Roblox's platform on a handful of dates in 2023 and 2024. 3-ER-214. According to Roblox, doing so would have required Mr. Uhl to assent to its August 2023 terms of service, which contain an arbitration clause. 3-ER-224. But Roblox did not present any evidence that Mr. Uhl made these purchases. Mr. Uhl does not have a Roblox account. 3-ER-240. The purchases were made on his *daughter's* account.

8

3-ER-204–-05, 240. And he submitted a declaration testifying that he did not make them. 3-ER-205.

***The parties' limited discovery.*** After Mr. Uhl filed his opposition, along with his declaration, Roblox sought limited arbitration-related discovery. SER-53–56. The parties agreed on a process for that discovery, which the court approved: Mr. Uhl would provide Roblox an updated declaration, the parties would meet and confer about the sufficiency of that declaration, and, if Roblox believed the declaration was insufficient, it could then seek the court's assistance in procuring any information it thought necessary. SER-55–58.[3]

As promised, Mr. Uhl provided an updated declaration. 3-ER-190–95. And following a series of meet-and-confers over email and Zoom, Mr. Uhl supplemented that declaration with additional responses to specific questions Roblox raised. 3-ER-196–99; 2-ER-69–78. Mr. Uhl explained that while he "occasionally purchase[d] gift cards for [his] children" from brick-and-mortar stores, he did not "personally" make any "payments to Roblox" either "since before the initiation of the litigation" or "subsequent to the initiation of the litigation." 3-ER-193 ¶¶ 15, 19, 20; 3-ER-197 ¶¶ 3,

---

[3] Roblox claims (at 19) that Mr. Uhl "refused to sit for a deposition or to produce documents." It's not clear what Roblox means, and the only citation it offers is its counsel making the same assertion below. Mr. Uhl neither refused to sit for a deposition nor produce documents. In fact, Mr. Uhl searched for documents at Roblox's request. 3-ER-197–98. Roblox agreed that limited discovery should occur by declaration. SER-55–58. If that was not enough, Roblox could have sought more discovery, but it declined to do so. *See id.*

4.[4] In other words, Mr. Uhl "did not make [the] purchases" on his daughter's account; "it was his child that did that." 2-ER-36, 103. Mr. Uhl explained that his payment information was saved on his daughter's phone and on the other devices she used to play Roblox—so although the purchases may have been made with his credit card, it was his daughter who made them. 3-ER-193 ¶ 16.

Having never purchased Robux on the Roblox platform, Mr. Uhl confirmed that he had never agreed to Roblox's terms of use, been emailed a copy of those terms or updates to them, authorized his daughter to accept those terms for him, or been asked by his daughter to do so. 3-ER-191 ¶ 3; 3-ER-197 ¶ 5.

Roblox did not request further information, it did not inform the court (or Mr. Uhl) that it believed Mr. Uhl's declarations were unclear or insufficient, nor did it seek to propound any additional discovery.

***Roblox's renewed motion to compel arbitration.*** Following discovery, Roblox renewed its motion to compel arbitration. Roblox asserted that its targeted discovery had "conclusively establishe[d]" that Mr. Uhl "received clear notice of and repeatedly agreed to Roblox's Terms of Use" that were in effect from 2018 through 2022 and had an arbitration clause throughout. Dkt. 80 at 1, 6 n.5. The sole

---

[4] Roblox argues (at 32) that the declaration's use of the word "since"—in "since before the initiation of the litigation"—must mean that sometime before the initiation of this lawsuit, Mr. Uhl did use his daughter's account to buy Robux. But Mr. Uhl has repeatedly explained otherwise. *See, e.g.*, 2-ER-36, 103.

evidentiary basis for that claim was that, according to Roblox, Mr. Uhl's supplemental declaration "admit[ted] *he* made all pre-June 14, 2022 Robux purchases, with a single exception on January 18, 2022"—not his daughter. *Id.* at 3 (emphasis in original). But Roblox did not point to any provision of any declaration that said that. *See id.* Roblox also argued that even if Mr. Uhl's daughter had made the in-game purchases on her account, by doing so, she somehow bound Mr. Uhl to Roblox's contract. 2-ER-59–61. Roblox told the district court that it "may decide the motion based on the pleadings, documents of uncontested validity, and affidavits submitted by either party." 3-ER-223–24.

***The district court's ruling.*** The district court denied the motion to compel. By choosing to spend a "protracted period of time" seeking a judicial decision on the merits, the court held, Roblox waived any right to compel arbitration. 1-ER-19. The court explained that Roblox knew of its claimed right to arbitrate "since the date [Mr. Uhl] was added as a party to this case." 1-ER-17. After all, Mr. Uhl alleged that his children were Roblox users, and that he'd therefore spent money on the platform. *Id.* But rather than move to compel arbitration, Roblox moved to dismiss on the merits. 1-ER-19. Citing this Court's case law, the court held that Roblox's "decision … to seek judicial judgment on the merits of" purportedly "arbitrable claims" was "inconsistent with a right to arbitrate." 1-ER-18

11

(quoting *Martin v. Yasuda*, 829 F.3d 1118, 1125 (9th Cir. 2016) and citing *Van Ness Townhouses v. Mar Indus. Corp.*, 862 F.2d 754, 759 (9th Cir. 1988)).

The court rejected Roblox's contention that it could not have waived its right to arbitrate because it couldn't have moved to compel arbitration without Mr. Uhl's daughter's username. 1-ER-17, 19. Roblox, the court explained, could have compelled "reasonable arbitration-related discovery." 1-ER-17 n.6. "Had [Roblox] been serious about compelling this action to arbitration, it would have taken advantage of the statutory resources available to it that evidence Congress' clear intent, in the Arbitration Act, to move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible." 1-ER-19 (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 22 (1983)). "Instead, Defendant has repeatedly sought to take advantage of this forum by asking this Court—over a protracted period of time—to dismiss this action." *Id.* Roblox, the court concluded, therefore "waived its right to compel arbitration." *Id.*

As an independent basis to deny the motion, the court also concluded that Roblox had not met its burden to demonstrate by a preponderance of the evidence that Mr. Uhl had agreed to arbitrate. 1-ER-14–15. The court explained that Mr. Uhl had not, in fact, admitted to using his daughter's account to make Robux purchases. *See* 1-ER-12–15. It recognized that the declarations were "less than clear." 1-ER-16. But it was Roblox's burden to prove an agreement. *Id*. And the fact that Mr. Uhl's *daughter*

had a Roblox account—along with some "ambiguous" statements—was insufficient to prove by a preponderance that *Mr. Uhl* had agreed to arbitrate. 1-ER-12–14. Nor, the court held, could Mr. Uhl's daughter bind him to Roblox's contract. 1-ER-14–15.

The court rejected Roblox's request—lodged in a footnote in its reply brief—for yet another round of discovery. 1-ER-16. Roblox, the court explained, had an opportunity "to seek the Court's intervention to obtain reasonable discovery" before filing its renewed motion to compel. *Id.* But it chose not to do so. That choice, the court held, "does not excuse its failure to carry its burden of proof, particularly given [its] delay in seeking to enforce its arbitration clause." Roblox "stake[d] [its] stratagems" on trying to use the inartfully drafted declarations to its advantage. *Id.* Having failed, it was not entitled to yet another bite at the apple. *See id.*

## STANDARD OF REVIEW

The Court may affirm on any ground supported by the record. *Brown v. Dillard's, Inc.*, 430 F.3d 1004, 1009 (9th Cir. 2005). An order denying a motion to compel arbitration is reviewed de novo. *Hill v. Xerox Bus. Servs., LLC*, 59 F.4th 457, 468 (9th Cir. 2023). Underlying factual findings are reviewed for clear error. *Knapke v. PeopleConnect, Inc.*, 38 F.4th 824, 830 (9th Cir. 2022). District court rulings concerning discovery are reviewed for abuse of discretion. *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 726 (9th Cir. 1999).

## SUMMARY OF ARGUMENT

Parties may not litigate for nearly a year, only to turn around and compel arbitration when they do not get the judicial decision they wanted. Nor may they compel arbitration without a validly formed agreement to do so. Here, Roblox tried to do both. The district court correctly rejected its attempt. This Court should do the same.

**I.** First, Roblox waived any right it might have had to compel arbitration. The company litigated in court for nearly a year. It was only when the district court denied its request to dismiss the lawsuit with prejudice that Roblox moved to compel arbitration. That about-face is quintessential waiver: Roblox knew about its claimed right to arbitrate from the start and acted inconsistently with that right by seeking a decision on the merits from the court.

**A.** Roblox protests that it couldn't have moved to compel arbitration sooner because it would not have won without more evidence. But the Federal Arbitration Act provides a mechanism to get the evidence needed to compel arbitration: limited arbitration-related discovery. For nearly a year, Roblox chose not to seek this discovery; instead, it asked the district court to rule on the merits of the claims. It was only once the court declined to dismiss those claims with prejudice that Roblox sought arbitration-related discovery, hoping, it seems, that arbitration would prove a more favorable forum. This Court—and courts across the country—have rejected

14

this gambit. Litigants cannot choose to forgo the tools available to them to quickly resolve arbitration and then claim that they could not have moved to compel sooner.

**B.** Roblox fares no better contending that it did not act inconsistently with a right to arbitrate. The paradigmatic act that is inconsistent with asserting a right to arbitrate is "mov[ing] for dismissal with prejudice on a key merits issue." *Newirth v. Aegis Senior Cmtys., LLC*, 931 F.3d 935, 942 (9th Cir. 2019). The whole point of arbitration is that the court does not decide the merits; the arbitrator does. Asking the court to dismiss with prejudice, and then moving to compel only if it does not, is precisely the kind of gamesmanship that waiver is designed to prevent.

**II.** Even if Roblox had not waived any right it might have had to arbitrate, it had no such right to begin with. Roblox argues that Mr. Uhl agreed to arbitrate by purchasing Robux on its mobile apps or website. To compel arbitration, then, Roblox would have to prove both that Mr. Uhl made those purchases and that by doing so, he formed a binding agreement with Roblox. It proved neither.

**A.** Roblox argues that anyone who purchases Robux on its mobile apps or website necessarily agrees to its terms, which include an arbitration clause. But to bind a purchaser to an online contract, a company must provide reasonably conspicuous notice of both the terms of that contract and what action will be deemed to constitute assent. And neither Roblox's mobile apps nor its website satisfy those requirements.

Roblox's mobile-app payment screen says nothing at all about Roblox's terms or that clicking "buy" will be construed as assenting to them. It says that the purchaser is *paying* for Robux—not agreeing to contract with Roblox. Roblox argues that small-print gray text on another screen solves the problem, but that screen is hidden behind the payment screen. So when consumers press the button that Roblox claims constitutes assent, there is nothing on screen telling them that they are not just paying, but also agreeing to lengthy contractual terms. Roblox's website is no better. The website tells purchasers that they are agreeing to contract with Xsolla, a payment processer, not Roblox.

**B.** And even if a purchaser hunted down Roblox's terms, the terms themselves are misleading. The opening lines say that the terms apply to "users"—and make clear that users are those who *play* Roblox, not those who merely make a Robux purchase. Roblox argues that additional provisions hidden further in the contract say otherwise, but consumers are not required to ferret out additional terms to confirm that a contract that says up front that it does not apply to them, in fact, does not apply.

**C.** Finally, even if those who purchase Robux on a Roblox app or website agree to arbitrate, Roblox failed to demonstrate that Mr. Uhl ever did so. In arguing otherwise, the company relies on purchases made by what it calls the "Uhl account." But that account belonged to Mr. Uhl's *daughter*. And Mr. Uhl has consistently denied

16

that he logged into his daughter's account on a game he did not play to purchase virtual currency he could not use. When Mr. Uhl wanted to buy Robux for his daughter, he explained, he bought gift cards from brick-and-mortar stores; he didn't try to log in to her account as her.

In arguing otherwise, Roblox seizes on concededly inartful drafting in Mr. Uhl's declarations. But a motion to compel arbitration is treated like a motion for summary judgment. So the district court could not grant the motion unless Roblox proved that *no* reasonable factfinder, taking all inferences in the light most favorable to Mr. Uhl, could find that the purchases on his daughter's account were, in fact, made by his daughter. And the declarations do not compel that conclusion.

The company argues that even if the court didn't grant the motion to compel arbitration, it should not have denied it without holding a trial. But Roblox never asked for a trial; it told the district court that it could decide the motion on the papers. If doing so was error, it was invited error. Roblox cannot now complain because the district court did what Roblox suggested it do.

In a last-ditch effort to manufacture assent, Roblox claims that it doesn't matter that Mr. Uhl did not make the purchases the company relies on. If his daughter made purchases with his permission, the company says, she acted as his agent and bound him to Roblox's contract. The California Supreme Court has already rejected this view of agency law: Granting a child permission does not

17

transform the child into an agent. And, in any event, an agent can only bind the principal to a contract if the principal has authorized the agent to do so. Mr. Uhl did not authorize his daughter to bind him to a contract with Roblox.

## ARGUMENT

### I. Roblox waived its claimed right to arbitrate.

"The right to arbitration, like other contractual rights, can be waived." *Martin v. Yasuda*, 829 F.3d 1118, 1124 (9th Cir. 2016). "[T]he test for waiver … consists of two elements: (1) knowledge of an existing right to compel arbitration; and (2) intentional acts inconsistent with that existing right." *Hill*, 59 F.4th at 468. This is a "holistic" inquiry. *Id.* at 471 n.16. "[E]valuating the totality of a party's actions guarantees that ambiguous actions are not explained away," when, in reality, they reflect the attempt to seek "judicial resolution of key merits issues that is inconsistent with that party's right to have such claims resolved in an arbitration forum." *Id.*

Here, Roblox knew all along of its claimed right to compel arbitration. The complaint alleges that Mr. Uhl's children played Roblox, and that Mr. Uhl spent money on Robux. According to Roblox, that means that he is required to arbitrate. Roblox claims that it needed his daughter's username to succeed on its motion to compel arbitration. But the proper course when a defendant believes it has a right to arbitrate, but needs further information to satisfy its burden of proof, is to seek arbitration-related discovery. It is not to ask a judge to decide the case on the merits.

18

Yet not only did Roblox wait almost a year to try to compel arbitration, it undertook the paradigmatic act that is "inconsistent" with a right to arbitrate: It asked the district court to rule on the merits of the very same claims it now contends an arbitrator must decide. Parties cannot ask the district court to dismiss a complaint with prejudice, holding in reserve a claimed right to arbitrate, to be exercised only if they don't like the district court's decision. This Court, and courts across the country, have rejected this heads-I-win, tails-you-lose maneuver. The court here was right to do the same.

### A. Roblox has known of its claimed right to arbitrate since Mr. Uhl filed his complaint.

**1.** Roblox has known of its claimed right to compel arbitration since Mr. Uhl filed his complaint. According to Roblox, every version of its terms of service from at least 2017 contains an arbitration clause. Opening Br. 8, 13; 1-ER-9–10; 2-ER-45, 126–27. And, Roblox contends, parents of Roblox users agree to these terms if either they personally purchase Robux or their child does so. *See* Opening Br. 30–32; 2-ER-59–61; 3-ER-214; Dkt. 80 at 2, 11. Mr. Uhl's complaint therefore alleged everything Roblox needed to know to be on notice of its right to compel arbitration: The

complaint alleged that Mr. Uhl's children played Roblox since 2017 and that he spent money on Robux "on at least a monthly basis" since then. 1-ER-17; SER-9, 21.[5]

Yet, still, Roblox chose to ask the court to dismiss the complaint with prejudice on the merits, rather than moving to compel arbitration. Indeed, in its motion to dismiss, Roblox included a footnote claiming to reserve the right to compel arbitration if the court did not do as it asked. *See* 3-ER-294 n.1. Roblox didn't wait to move to compel because it didn't know it had a right to do so; it waited because it preferred a public judicial ruling that the claims were barred entirely, rather than an order compelling them to arbitration. Only once it did not get what it wanted did it try, in earnest, to compel arbitration.

**2.** Roblox claims that it could not have moved to compel arbitration sooner because it needed Mr. Uhl's daughter's username. But Roblox conceded to Mr. Uhl's counsel that it had already "decided" to compel arbitration before receiving the username. 3-ER-241. Roblox didn't need that information to *know* that it had a right to arbitrate. Instead, Roblox claims, it needed the username to meet its "burden of proof" *when* it moved to compel. Opening Br. 51; *see also* 2-ER-32 (Roblox's counsel explaining that they believed they could get the information necessary through

---

[5] To be clear, Mr. Uhl did not personally make in-game purchases of Robux; his daughter made those purchases. But according to Roblox, that doesn't matter. 2-ER-59–61; Opening Br. 30–32.

discovery, but chose to wait to seek that discovery until after they got a ruling on the motion to dismiss).

Either way, Roblox had "knowledge of circumstances that would have allowed [it] to raise the prospect of arbitration much earlier." *Houghton v. Polychain Alchemy, LLC*, 2025 WL 2965204, at \*1 (9th Cir. 2025). And that is all that's required. *See id.* "[F]or waiver purposes, knowledge of an existing right to arbitrate" does not "require[] a present ability to move to enforce an arbitration agreement." *Hill*, 59 F.4th at 469. It requires "notice that [a plaintiff's] claims could be arbitrable." *White v. Samsung Elecs. Am., Inc.*, 61 F.4th 334, 340 (3d Cir. 2023); *see Houghton*, 2025 WL 2965204, at \*1 (defendant knew of existing right to arbitrate because company's terms contained arbitration clause, even though defendant needed discovery to confirm the plaintiff agreed to those terms); *Parker v. Kearney Sch. Dist.*, 130 F.4th 649, 654 (8th Cir. 2025) (party "knew of its existing right to arbitration because it possessed the arbitration agreement," even though it did not yet "kn[ow] for certain" that it applied to the plaintiffs); *Smith v. GC Servs. Ltd. P'ship*, 907 F.3d 495, 499–500 (7th Cir. 2018) (similar).

That's because a party need not wait until it has all the evidence required to *win* a motion to compel arbitration before filing one. *Knapke*, 38 F.4th at 833. Rather, the "procedure" under the Federal Arbitration Act is that a party files a motion to compel, and then, if necessary, seeks discovery. *Id.*; *see Houghton*, 2025 WL 2965204, at

21

*1 (rejecting argument that the defendant lacked sufficient knowledge to move to compel, because it had sufficient information to seek arbitration-related discovery (citing *Knapke*, 38 F.4th at 833)); *see also Smith*, 907 F.3d at 500 (explaining that defendant bore the burden to investigate and seek discovery regarding arbitration).

Contrary to Roblox's contention (at 53–54), this rule is not limited to motions to compel arbitration of absent class members. Courts across the country—including this one—have applied the rule in cases just like this one. Thus, in *Houghton*, this Court held that the defendant knew of its existing right to compel arbitration because it knew that the plaintiff had purchased a virtual currency, and that the user agreement for the platform that sold the currency contained an arbitration clause. 2025 WL 2965204, at *1. "[T]he lack of certainty regarding whether [the plaintiff] accepted the User Agreement," the Court explained, "does not negate knowledge of circumstances that would have allowed [the defendant] to raise the prospect of arbitration much earlier." *Id.* "[E]ven if it lacked a present ability to move to compel arbitration until it definitively knew whether" the plaintiff had accepted the user agreement, the Court reasoned, it knew enough to seek "limited discovery" on that point. *Id.* By choosing to instead litigate on the merits, the Court held that the defendant waived its right to arbitrate. *See id.*

The Third Circuit came to a similar conclusion in *White*. There, the plaintiffs had to agree to terms and conditions to set up the SmartTVs on which they based

their claims, but not all versions of the terms contained an arbitration clause. 61 F.4th at 336–37. Samsung tried to defend its delay in moving to compel arbitration by claiming that it could not have known of its right to arbitrate until it had the model and serial numbers of the plaintiffs' TVs. *Id.* at 340. But the Third Circuit disagreed. *Id.* Samsung was "always aware that the Model and Serial Numbers of the specific TVs were necessary to determine with accuracy whether plaintiffs agreed to arbitrate their claims." *Id.* Yet instead of seeking this information through limited arbitration-related discovery, it moved to dismiss on the merits. *Id.* That, the court held, "demonstrates a waiver of its alleged right to arbitrate." *Id.* The Seventh and Eighth Circuits agree. *See, e.g.*, *Parker*, 130 F.4th at 654–55; *Smith*, 907 F.3d at 500. The consensus rule is that parties cannot choose to forgo the tools available to them to discover the information needed to compel arbitration, and then claim that they did not know they had a right to arbitrate.[6]

---

[6] In arguing to the contrary, Roblox cites only a few district court cases, none of which supports its position. In *Saeedy v. Microsoft Corp.*, 757 F. Supp. 3d 1172, 1186 (W.D. Wash. 2024), unlike here, the plaintiffs did not initially allege information sufficient to put the defendant on notice of its right to compel arbitration; once they amended their complaint to allege that information, the court held that was enough. The court did not hold, as Roblox suggests here, that allegations are insufficient absent proof. In *Caccuri v. Sony Interactive Ent. LLC*, 735 F. Supp. 3d 1139, 1151 (N.D. Cal. 2024), the court held that the defendant knew of its right to compel arbitration because it stated in a filing that it intended to move to compel. That's exactly what Roblox did here in its motion to dismiss. And in Roblox's other two cases, there wasn't even a dispute about knowledge. *See FBC Mortg., LLC v. Skarg*, 699 F. Supp. 3d 837, 842 (N.D. Cal. 2023); *Fox v. Experian Info. Sols., Inc.*, 718 F. Supp. 3d 1231, 1238 (E.D. Cal. 2024).

23

That's precisely what Roblox did here. Roblox claims (at 57) that "[a]ny delay in bringing the motion to compel arbitration was due to Uhl's counsel refusing to provide the requested usernames for nearly a year." Roblox's sole citation for that claim is an email Roblox sent to counsel before Mr. Uhl was even a plaintiff, asking for the prior named plaintiffs' usernames "to confirm that [they] are Roblox users and to assess [their] request that Roblox refund them for amounts spent on the platform." 3-ER-238. No mention of arbitration. And counsel did not refuse; they asked Roblox to propound a discovery request for that information. 3-ER-236.

But instead of doing so, Roblox removed the case to federal court and filed a motion to dismiss the complaint on the merits with prejudice. Only then—once it had already delayed moving to compel arbitration for months—did Roblox mention usernames in connection with arbitration. And even then, the company mentioned it only in a footnote in its motion to dismiss, as an excuse for the company's attempt to reserve its right to compel arbitration if the district court did not rule the way that Roblox requested. *See* 3-ER-294 n.1. Roblox could have moved for arbitration discovery, rather than filing a motion to dismiss. Or it could have asked to stay briefing on the motion to dismiss, so it could seek the username it claimed to need to move to compel. Instead, it sought a judicial determination on the merits of its claims. Only when it lost its bid for dismissal with prejudice did it turn in earnest to compelling arbitration. And when it then emailed Mr. Uhl's counsel asking for his

24

daughter's username in support of its belated motion to compel, counsel provided it the next day. 3-ER-240–41.

Roblox's delay was not due to insufficient knowledge. If it were, it would have sought the discovery the Federal Arbitration Act provides. Roblox delayed because it wanted a judicial determination dismissing the claims with prejudice. "Therefore, the district court was correct in concluding that" Roblox sufficiently "knew of [its] right to compel arbitration" to have waived that right. *Houghton*, 2025 WL 2965204, at *1.

### B. Roblox acted inconsistently with a right to compel arbitration.

**1.** Parties can act inconsistently with a right to arbitrate in numerous, varied ways. So "[t]here is no concrete test to determine whether a party has engaged in acts that are inconsistent with its right to arbitrate." *Martin*, 829 F.3d at 1125. But it's well established that "a conscious decision to … seek judicial judgment on the merits of the arbitrable claims" is "inconsistent with a right to arbitrate." *Id.* After all, the point of arbitration is that an arbitrator—not the court—decides the merits. Thus, the paradigmatic act that is inconsistent with a right to arbitrate is "when defendants move for dismissal with prejudice on a key merits issue." *Newirth v. Aegis Senior Cmtys., LLC*, 931 F.3d 935, 942 (9th Cir. 2019), *abrogated on other grounds by Morgan v. Sundance, Inc.*, 596 U.S. 411 (2022); *see Armstrong v. Michaels Stores, Inc.*, 59 F.4th 1011, 1015 (9th Cir. 2023) ("Obviously, seeking a decision on the merits of a key issue in a case indicates

an intentional and strategic decision to take advantage of the judicial forum."). "[D]efendants may not play heads I win, tails you lose by" seeking "an immediate and total victory in court," while "keeping arbitration in reserve just in case a court does not reject the entire case at the start." *Kloosterman v. Metro. Hosp.*, 153 F.4th 501, 508 (6th Cir. 2025).[7]

Roblox did so here: It asked the district court to "dismiss … with prejudice" all of Mr. Uhl's claims on the merits. Dkt. 58, at 1. And only when the court declined—holding only that Mr. Uhl needed to amend his complaint to allege his

---

[7] This is not just the rule in the Sixth and Ninth Circuits. Like the knowledge rule that Roblox resists, it's the rule in circuits across the country. *See, e.g.*, *Doyle v. UBS Fin. Servs., Inc.*, 144 F.4th 122, 132 (2d Cir. 2025) ("The UBS Defendants' decision to *first* seek full and final resolution of the claims against them in federal court is inconsistent with the right to arbitrate those same claims."); *White*, 61 F.4th at 340 (holding that a defendant waived arbitration by filing motions to dismiss on the merits because it "clearly sought to have [the] case dismissed by a court on the merits," waiting to "attempt to arbitrate" the claim until "after it was apparent that … it could not get the case fully dismissed before discovery"); *St. Mary's Med. Ctr. of Evansville, Inc. v. Disco Aluminum Prods. Co.*, 969 F.2d 585, 589 (7th Cir. 1992) ("Especially telling was [the defendant's] motion to dismiss. Submitting a case to the district court for decision is not consistent with a desire to arbitrate. A party may not normally submit a claim for resolution in one forum and then, when it is disappointed with the result in that forum, seek another forum."); *Hooper v. Advance Am., Cash Advance Centers of Mo., Inc.*, 589 F.3d 917, 921–22 (8th Cir. 2009), *abrogated on other grounds by Morgan*, 596 U.S. 411 (holding that an "extensive and exhaustive" motion to dismiss that "encouraged the district court to resolve the parties' entire dispute in [the defendant's] favor" was inconsistent with a right to arbitration, noting that the defendant "wanted to see how the case was going in federal district court before deciding whether it would be better off there or in arbitration").

26

claims with greater particularity—did Roblox then change course and move to compel arbitration. Dkt. 47, at 15.

**2.** Roblox argues (at 60) that moving to dismiss is not necessarily inconsistent with a right to compel arbitration—citing, as an example, *Lake Communications, Inc. v. ICC Corp.*, where the defendant moved to dismiss for lack of personal jurisdiction. 738 F.2d 1473, 1476–77 (9th Cir. 1984), *overruled on other grounds by Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614 (1985). But "[u]nlike a motion to dismiss on the merits," a motion to dismiss for lack of jurisdiction "does not choose a court over an arbitrator for a decision that resolves the dispute." *Kloosterman*, 153 F.4th at 510. It asks the court to decide an issue that an arbitrator cannot possibly resolve: whether the court has power over the parties—and therefore power to compel arbitration— in the first place. A motion to dismiss is inconsistent with the right to arbitrate if it asks the court to decide issues that, if the right to arbitrate were enforced, must be decided by the arbitrator. *See Martin*, 829 F.3d at 1125 (distinguishing a motion to dismiss on the merits from other motions to dismiss and citing several cases for the proposition that "[a] party waives arbitration by seeking a decision on the merits before attempting to arbitrate").

Roblox is wrong that this principle conflicts with this Court's case law. Again, this Court has repeatedly held that "[s]eeking a decision on the merits of a key issue in a case indicates an intentional and strategic decision to take advantage of the

27

judicial forum." *Newirth*, 931 F.3d at 941; *see Armstrong*, 59 F.4th at 1015. That's inconsistent with the right to compel arbitration. *Id.* In arguing otherwise, Roblox relies on old cases that understood Supreme Court precedent to require courts to favor arbitration. *See, e.g.*, *Glob. Sec. & Commc'ns, Inc. v. AT&T*, 191 F.3d 460 (9th Cir. 1999). They therefore applied an arbitration-specific rule that a party "arguing waiver of arbitration"—unlike other contractual rights—"bears a heavy burden of proof." *Id.* at *1. But as this Court has recognized, the Supreme Court abrogated that precedent nearly five years ago. *See Armstrong*, 59 F.4th at 1014 (discussing *Morgan*, 596 U.S. 411). The Court explained that lower courts had misunderstood its case law: There is no "strong federal policy favoring enforcement of arbitration agreements," and parties arguing waiver of the right to arbitrate do not face a "heavy" burden. *Id.*

And the cases that Roblox cites are inapposite even on their own terms. The best support Roblox can muster is this Court's unpublished decision from more than twenty-five years ago in *Global Security*. There, the defendant moved to compel arbitration nine weeks after the complaint was filed—not almost a year later, like Roblox. 191 F.3d at *1. Unlike here, where Roblox moved to compel based on its *own* terms of use, the defendant there had to rely on a contract between the plaintiff and a third party—meaning it didn't initially know whether the plaintiff's contract had an arbitration clause. *Id.* And in *Global Security*, the defendant undertook a substantial investigation to find out immediately after the complaint was filed, propounded a

discovery request seeking that contract, and moved to compel arbitration before the court ruled on a motion to dismiss. *Id.* This Court's decision not to apply waiver under those circumstances, in an unpublished decision relying on a heightened standard that no longer applies, is not much authority for the proposition that it's consistent with a right to arbitrate to wait almost a year to move to compel, doing so only after seeking a judicial ruling on the merits of the supposedly arbitrable claims.

Even if this Court were to add an additional waiver requirement—and hold that seeking a decision on the merits is not enough—Roblox didn't merely move to dismiss on the merits. It also removed the case from state court, litigated a remand motion, and never—during the eleven months it was litigating—sought a stay pending a determination of whether the lawsuit should be in court at all. And it waited almost a year to move to compel. That "prolonged delay[]," Opening Br. 61, is similar to or longer than delays in cases where this Court and others found waiver—in many cases, even under the now-foreclosed heightened standard. *See, e.g.*, *Gile v. Dolgen Cal., LLC*, 2022 WL 17248087, at *1 (9th Cir. 2022) (eleven months); *Kelly v. Pub. Util. Dist. No. 2 of Grant Cnty.*, 552 F. App'x 663, 664 (9th Cir. 2014) (eleven months); *Support Cmty., Inc. v. MPH Int'l, LLC*, 2025 WL 547380, at *1 (9th Cir. 2025) (ten months); *Gray Holdco, Inc. v. Cassady*, 654 F.3d 444, 454–55 (3d Cir. 2011) (ten months); *Joca-Roca Real Estate, LLC v. Brennan*, 772 F.3d 945, 949, 951 n.7 (1st Cir. 2014) (nine months); *Messina v. N. Cent. Distrib., Inc.*, 821 F.3d 1047, 1051 (8th Cir. 2016) (eight

29

months); *Adolph v. Coastal Auto Sales, Inc.*, 110 Cal. Rptr. 3d 104, 110–11 (Cal. Ct. App. 2010) (six months). Waiver is designed to address litigation conduct exactly like Roblox's—a defendant trying to litigate the merits of the case for nearly a year and only raising arbitration when it decides the judicial proceedings have not been favorable enough.

**3.** Falling back, Roblox argues (at 65–68) that the Federal Arbitration Act *requires* that courts allow defendants to wait a year—or more—and get a judicial ruling on the merits before moving to compel arbitration. That would be quite surprising, as the Act itself prohibits courts from compelling arbitration if the party seeking to arbitrate is in "default in proceeding with such arbitration." 9 U.S.C. § 3. And a "party who seeks" a "judicial win on the merits is in 'default' of an arbitration agreement because the party has failed to 'observe'—indeed, has affirmatively disavowed—the 'promise' to arbitrate the merits." *Kloosterman*, 153 F.4th at 508 (quoting *Black's Law Dictionary* 342 (2d ed. 1910)).

According to Roblox (at 66), though, the FAA prohibits courts from holding that the same conduct waives a contractual right to arbitrate. Roblox asserts that affirmative defenses are not ordinarily waived unless they are not asserted in an answer. And arbitration is an affirmative defense. But this Court—and others—have had no trouble concluding that defendants waived a contractual right to compel arbitration by acting inconsistently with that right, even if they have not yet filed an

answer. *See, e.g.*, *Newirth*, 931 F.3d at 942–43; *White*, 61 F.4th at 337–38, 340–41; *In re Pawn Am. Consumer Data Breach Litig.*, 108 F.4th 610, 612–13 (8th Cir. 2024).

Roblox's contention, then, is that by holding that the right to compel arbitration may be waived by moving to dismiss on the merits, this Court's case law discriminates against arbitration. As an initial matter, Roblox seems to have confused two different doctrines that both sometimes go by the name of waiver. The doctrine that Roblox invokes is more technically called forfeiture: An affirmative defense may be forfeited by failing to assert it at the right time or by the right procedure. *See In re Cellular 101, Inc.*, 539 F.3d 1150, 1155 (9th Cir. 2008) (citing, *e.g.*, Fed. R. Civ. P. 8(c)); *see also id.* at 1155 n.2 (describing "forfeiture" as the "more accurate term" for "the loss of an affirmative defense through the failure to raise it in a timely manner"). Waiver is a different, but related, concept: "Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right." *United States v. Olano*, 507 U.S. 725, 733 (1993); *Morgan*, 596 U.S. at 417. A party can intentionally relinquish a right—expressly or by acting inconsistently with that right—regardless of whether it has filed an answer.

Moreover, as the Eighth Circuit has explained, the Federal Arbitration Act does not prohibit courts from "translating garden-variety waiver principles into specific litigation contexts." *In re Pawn Am. Consumer Data Breach Litig.*, 108 F.4th at 613.

31

Under either forfeiture or waiver, "[f]ocusing on litigation conduct" inconsistent with a right to arbitrate "zeroes in on the most relevant conduct without tilting the playing field in favor of (or against) arbitration." *Id.* Nothing prohibits courts from doing so.

**4.** Unable to find support in this Court's case law, Roblox turns to policy. If defendants are not permitted to seek a merits ruling from the district court before seeking the same ruling from an arbitrator, Roblox complains (at 69), it will "reward gamesmanship by parties resisting arbitration." But the FAA—and this Court's case law—already prevent that kind of gamesmanship. Parties seeking to compel arbitration can take the limited, targeted discovery they need to do so, backed by the threat of sanctions for noncompliance. *See supra* I.A. Roblox argues (at 70) that allowing targeted discovery is "antithetical" to the FAA's goal "to move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible." According to Roblox, the more efficient path is to allow defendants to move to dismiss on the merits and, if they do not get the answer they hoped for, they can *then* seek the targeted discovery they need to move to compel arbitration. But that's a waste of judicial and party resources.

Roblox could have moved to compel arbitration from the outset of this case— and it should have, if it wanted to preserve that right. Even under the company's telling, Roblox at most needed to propound one interrogatory and one request for

admission: (1) what is your daughter's Roblox username and (2) admit or deny that you personally made in-game purchases on your daughter's account. Allowing companies to avoid doing so and claim ignorance of a right to compel arbitration so that they can take advantage of the judicial forum is precisely the kind of gamesmanship that waiver is designed to prevent.

**II.    Roblox did not prove the existence of an agreement to arbitrate between the company and Mr. Uhl.**

Arbitration is "a matter of consent, not coercion." *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989). A "party may not be compelled" to arbitrate, therefore, "unless there is a contractual basis for concluding that the party *agreed* to do so." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 684 (2010) (emphasis in original). "As the party seeking to compel arbitration," Roblox "bears the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence." *Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279, 1283 (9th Cir. 2017). It did not—and cannot—satisfy this burden.

Roblox argues that Mr. Uhl agreed to arbitrate by purchasing Robux on its platform, either on a mobile phone or on its website. But contracts require notice and assent. And Roblox has demonstrated neither. If an internet company wants to bind purchasers to its terms when they hit "buy," it has to tell them that on the payment screen. Roblox didn't do so. That means there's no notice. And even if it

33

did, Mr. Uhl did not make the purchases Roblox relies on; his daughter did. That means there's no assent.

### A. Roblox does not provide Robux purchasers reasonably conspicuous notice of its terms or that they will be bound to those terms.

Roblox argues that purchasing Robux on its platform binds the purchaser to its terms, which include an arbitration clause. Under California law, an online contract is enforceable if the internet platform: (1) "provides reasonably conspicuous notice of the terms to which the consumer will be bound"; and (2) "the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Chabolla v. ClassPass Inc.*, 129 F.4th 1147, 1154–55 (9th Cir. 2025); *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 35 (2d Cir. 2002) (explaining that these requirements "are essential if electronic bargaining is to have integrity and credibility"). Of course, the "click of a button can be construed as an unambiguous manifestation of assent only" if the purchaser "is explicitly advised that the act of clicking will constitute assent to the terms." *Chabolla*, 129 F.4th at 1158; *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 857 (9th Cir. 2022). Thus, to bind online purchasers to its terms, Roblox must both provide "reasonably conspicuous" notice of those terms *and* notify purchasers of the action that will bind them to those terms. Roblox makes virtually no effort to demonstrate that it satisfied these requirements. Opening Br. 40–42. It can't.

34

Whether an internet platform has provided sufficient notice is a "fact-specific" inquiry into both the text itself and "the visuals involved with the notice, such as font size, text placement, and overall screen design." *Chabolla*, 129 F.4th 1147 at 1155. Roblox's sole attempt to engage in this inquiry is a handful of conclusory bullet points, divorced from the screens that purchasers actually see when they buy Robux. Opening Br. 40–41. An examination of those screens demonstrates that they neither provide reasonably conspicuous notice of the company's terms, nor that the purchaser is binding themselves to those terms.

There are three ways to access Roblox and therefore to purchase Robux through its platform: iPhone app, Android app, and Roblox's website. None provides sufficient notice.

***Roblox's iPhone and Android app.*** Roblox claims (at 42) that the payment screen on its phone apps "expressly inform[s]" Robux purchasers that they are "agreeing to Roblox's Terms." Not so.

**1.** The purchase screen on the iPhone app says nothing at all about Roblox's terms:

35



2-ER-126. The screen lists the Robux package being sold, provides the purchase price, and tells the purchaser to "Double Click to Pay" and "Confirm with Side Button." No mention of Roblox's terms. At best, this screen provides no notice at all. At worst, it is affirmatively misleading: Roblox says that double-clicking the side button will pay for a purchase, not that it will bind the purchaser to an extensive contract with the company. *See Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1035 (7th Cir. 2016) ("[W]here a website specifically states that clicking means one thing, that click does not bind users to something else."); *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 294 (2d Cir. 2019) (insufficient notice where the hyperlink containing the contract terms was not visible "anywhere on the purchase page").

36

**2.** The payment screen on the Android app is no better:



2-ER-126.

This screen, too, lists the item being purchased, its price, and how to pay for it: "1-tap Buy." Again, it says nothing at all about a contract with Roblox. The screen does mention terms, but they are *Google*'s terms: "By tapping '1-tap buy,' you accept the following *Google* Payments terms of service." 2-ER-126 (emphasis added). Roblox cannot bind purchasers to a contract with Roblox by telling them they are entering a contract with someone else. *See Doe v. Massage Envy Franchising, LLC*, 87 Cal. App. 5th 23, 31–32 (2022) (no agreement formed where screen did not indicate that plaintiff was agreeing to "an entirely different contract with an entirely different entity");

*Herzog v. Superior Court*, 101 Cal. App. 5th 1280, 1297–99 (2024) (similar); *Sgouros*, 817 F.3d at 1035 (no agreement formed where the screen "actively misleads" the consumer).

**3.** Thus, contrary to Roblox's assertion (at 42), neither app's payment screen "expressly inform[s]" a purchaser that they are "agreeing to Roblox's terms"—or even that Roblox *has* terms. Roblox offers no explanation for its contrary claim in its argument. But the accompanying citation leads to Roblox's statement of the case, which says (at 11) that Robux purchasers on a mobile phone are "presented with" this disclosure "at the top of the screen":



Roblox neglects to mention that when purchasers buy Robux, this "disclosure" is "at the top" of a *different* screen that becomes *grayed out* and hidden behind the payment screen. The text that Roblox relies on is on a screen that lists Robux packages for purchase. *See* 2-ER-126. And once a purchaser selects a package, the payment screen pops up on top. *See id.* Again, the actual payment screens, which Roblox does not include in its brief, look like this:

38



*iPhone*             *Android*

2-ER-126. The "disclosure" Roblox relies on is the cut-off text on the grayed-out screen behind the iPhone payment screen, and entirely invisible on the Android screen.

"Text advising users of terms should be spatially coupled with the act deemed to manifest assent to those terms," *Domer v. Menard, Inc.*, 116 F.4th 686, 698 (7th Cir. 2024)—not on a prior screen, grayed out and hidden once it actually comes time to buy. *See id.*; *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1179 (9th Cir. 2014) (emphasizing the importance of "close proximity" between hyperlink to terms and "relevant buttons user[s] must click on"); *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 236–37 (2d

Cir. 2016) (declining to find notice where "the presentation of terms" was not "directly adjacent" to the action button). In *Godun v. JustAnswer LLC*, 135 F.4th 699 (9th Cir. 2025), the text purporting to provide notice was separated from the button supposedly manifesting assent by only two lines:



*Id.* at 705. Nevertheless, this Court held that was not enough. Because the "advisal" was not "located directly above or below the action button and [was] displayed in relatively small text," "a reasonably prudent" purchaser would not be on "notice of the contract." *Id.* at 712. Roblox's advisal is on a separate page obscured from view.

That's not the only problem. The image of Roblox's "disclosure" that it reprints in its brief is cropped from the screen on which it appears and enlarged.

*Compare* Opening Br. 11 *with* 2-ER-125. In reality, the text is in tiny gray font on a gray background atop a screen cluttered with a list of Robux packages for purchase. *Cf. Berman*, 30 F.4th at 856–57 (finding the "text disclosing the existence of the terms" to be "the antithesis of conspicuousness" where it was "printed in a tiny gray font," "deemphasized by the overall design of the webpage," and "buried" rather than "prominently displayed"). Roblox has never offered a full screenshot of this screen, but it is the screen behind the payment screen in the iPhone screenshot included above. 2-ER-126.

Not only is the text gray-on-gray, and the screen cluttered, the link to Roblox's terms is not "set apart" to "draw the attention of the consumer." *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 481 (2021). If Roblox wanted purchasers to notice the link, it would have used "a contrasting font color (typically blue)" and "all capital letters." *Berman*, 30 F.4th at 857. Roblox's link is gray and sentence case. *See id.* ("Simply underscoring words or phrases, as in the webpages at issue here, will often be insufficient to alert a reasonably prudent user that a clickable link exists.").

Internet companies "have complete control over the design of their" apps. *Berman*, 30 F.4th at 857. It's not hard to provide reasonably conspicuous notice: Roblox could have required purchasers to click a box next to a statement in large font, "By clicking this box, you agree to Roblox's TERMS AND CONDITIONS." *See Berman*, 30 F.4th at 856. Instead, Roblox chose to hide any mention of its terms—

41

or that a purchaser might be bound to them—in tiny gray text on a gray background on a cluttered screen that gets covered by the payment window that tells purchasers that their actions will do something *other* than bind them to Roblox's terms. That is not how contracts are formed. *See id.*

**Roblox's website.** Roblox fares no better trying to rely on its website. The company relies on the following screen:



2-ER-124. The purported notice language is in "small print" sandwiched between a box at the top of the screen, which contains "the payment fields where the consumer's attention would necessarily be focused," and the box to enter an email

address. *Sellers*, 73 Cal. App. 5th at 480–81; *see Berman*, 30 F.4th at 856–57 (no notice where the purported disclosure text is in a font "considerably smaller than the font used in the surrounding website elements"); *Godun*, 135 F.4th at 712 (no notice where the purported notice language is not located "directly above or below the action button and is displayed in relatively small text").

Even if the font size and placement were not disqualifying, the notice is affirmatively misleading. It tells purchasers that they are "agree[ing] to be bound by *Xsolla's* End-User License Agreement, Privacy Policy, Refund Policy, Roblox Terms … ." 2-ER-124 (emphasis added); *contra* Opening Br. 9 (using ellipses to omit the part of the text that says that the list of agreements a purchaser is agreeing to are "Xsolla's' agreements). The ordinary meaning of that sentence is that each of the hyperlinked policies in the list is "Xsolla's": Xsolla's End-User License Agreement, Xsolla's Privacy Policy, Xsolla's Refund Policy, and Xsolla's Roblox Terms.[8] A purchaser cannot have reasonable notice that they are agreeing to a contract with Roblox when the disclosure says only that they are agreeing to a list of "Xsolla's" contracts. *See, e.g., supra* II.A; *Massage Envy*, 87 Cal. App. 5th at 31–32.

---

[8] Given the context, a purchaser would reasonably interpret the reference to "Xsolla's" "Roblox Terms" to mean Xsolla's terms governing purchases of Roblox products like Robux.

43

### B. Roblox's terms would not lead a reasonable consumer to believe that they bind those who do not play Roblox.

Even Roblox's terms themselves do not give Robux purchasers reasonable notice that they bind those who merely make a Robux purchase. From their opening lines, both the 2018 and 2022 versions of Roblox's terms speak directly to "*users*" of *Roblox*—that is, those who "develop" and "play" the game. 2-ER-136 (emphasis added); *see id.* ("Welcome to Roblox! You have entered what we like to call the Imagination Platform ('Platform'), the ultimate virtual universe where imagination rules. The Platform is part of a service offered by Roblox that allows users to develop games, connect with other users to play games, and use content created by you and other users."); 2-ER-155 ("Welcome to the Roblox universe, where imagination and creativity rule! Roblox Corporation … offers the Platform and various other features and services … to allow users to play, create and connect."). The terms then specify that they bind only "users" of the Roblox platform. 2-ER-136 ("[W]e set out below the terms and conditions … that you, a user, … must follow."); 2-ER-155 (stating that "terms and conditions … apply to use of the Services by Users").

Roblox insists (at 42–44) that other provisions buried in the terms or in a separate document altogether specify that parents of Roblox users are bound by the terms. But consumers aren't required to "ferret out" the information needed to reasonably understand what they're agreeing to. *Nguyen*, 763 F.3d at 1179. Instead, the "onus" was on Roblox to make clear that, if it wanted its terms to apply beyond those

44

who actually played the game, others would reasonably understand that. *Id.* If a company's terms start by saying they apply to someone else, a reasonable consumer would have no reason to read further. That's especially true here: It makes perfect sense that a reasonable consumer would expect Roblox's terms to bind those who play the game—they are in an "ongoing relationship" with the company. *Sellers*, 73 Cal. App. 5th at 476. Those who just buy Robux for someone else are not.

## C. Roblox did not demonstrate that Mr. Uhl assented to its terms.

Roblox's effort to compel arbitration fails for another reason: Even if Roblox binds Robux purchasers to its terms, Mr. Uhl never bought Robux on the company's platform. It's undisputed that Mr. Uhl does not have a Roblox account. 3-ER-240. What Roblox calls the "Uhl account" was his *daughter's* account. 3-ER-197. And the purchases Roblox relied on in moving to compel arbitration were made on that account. Dkt. 80 at 2-3. Although Mr. Uhl was automatically charged for those purchases, that's because his payment information was linked to her account. 3-ER-193 ¶ 16. But Mr. Uhl himself was not playing Roblox, and he was not making in-game purchases. *See* 3-ER-193 ¶ 15, 3-ER-197 ¶ 3. His daughter was. 3-ER-193 ¶ 16; 2-ER-36. Mr. Uhl, therefore, never saw the screens that Roblox claims would have notified him of its terms, nor pressed any button that Roblox claims would have manifested assent to those terms.

45

Roblox argues that doesn't matter. Simply by giving his daughter permission to play Roblox or buy virtual items when doing so, the company says, Mr. Uhl enlisted his daughter as his agent, whose remit included binding Mr. Uhl to a lengthy contract with the company. That's not how agency law works: An agent is someone charged with performing a task on the principal's behalf. When parents allow their children to play a game or buy something, they're allowing the child to do something on the child's *own* behalf—not making the child their agent, let alone authorizing their child to bind them to complicated contracts.

### 1. Roblox did not demonstrate by a preponderance of the evidence that Mr. Uhl made the in-game purchases on his daughter's account.

**a.** In most cases where a company tries to compel arbitration based on an online account, the plaintiff owns that account. And the argument is that in the process of creating or using that account, the plaintiff agreed to the company's terms. Roblox's argument is different. Roblox can't rely on Mr. Uhl's account because he didn't have one. Instead, it claims that the district court was required to grant its motion to compel arbitration because there were purchases of Robux on Mr. Uhl's *daughter's* account. Again, "[a]s the party seeking to compel arbitration," Roblox bore "the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence." *Norcia*, 845 F.3d at 1283. So to compel arbitration based on Mr. Uhl's daughter's transactions, Roblox had to demonstrate "by a

46

preponderance of the evidence" that, in fact, it was Mr. Uhl himself who had made them.

But, as the district court concluded, Roblox failed to do so. 1-ER-13–14. In arguing otherwise below, Roblox claimed that Mr. Uhl himself admitted making these purchases in his declarations. But the declarations don't say that. And Mr. Uhl has consistently explained that he did not use his daughter's account—to make purchases or otherwise. *See* 3-ER-193 ¶ 15; 3-ER-197 ¶ 3 (declarations explaining that Mr. Uhl did not "personally" make purchases on the Roblox platform); *see also* 2-ER-36 (counsel for Mr. Uhl describing "initial declaration" as "crystal clear that he did not make purchases on the Web platform or through the app store"); 2-ER-44 (explaining that Mr. Uhl did not even know the password to the account); 2-ER-103 ("Mr. Uhl's declaration" "confirms that he did not personally make these purchases."). Mr. Uhl occasionally "purchased with cash gift cards" for "his children" from retailers—not from Roblox itself—as birthday or holiday gifts. 1-ER-14; 3-ER-197 ¶ 4; *see also* 3-ER-193–94 ¶ 19. But Roblox doesn't claim that Mr. Uhl somehow agreed to Roblox's terms by purchasing a gift card from a brick-and-mortar store.

Roblox's claimed admission is merely inartful drafting. Roblox argues (at 31) that because Mr. Uhl's declarations specifically denied making some purchases on his daughter's account, he must be understood to have admitted that he made the

47

rest. But these specific denials came in response to questions Roblox asked Mr. Uhl to answer. Mr. Uhl viewed his "initial declaration" as "crystal clear that he did not make purchases on the Web platform or through the app store" at all. 2-ER-36; *see also* 2-ER-103 ("[I]n Mr. Uhl's declaration, he confirms that he did not personally make these purchases[.]"). "[I]t was his child that did that." 2-ER-36. He mentioned specific transactions in response to questions posed by Roblox in meet-and-confers over email and Zoom. *Compare, e.g.*, 2-ER-74, *with* 3-ER-194 ¶ 20, 3-ER-198 ¶ 6; *see also* 2-ER-35 (explaining the "reason" the declarations were "done in this format"); 2-ER-38 (explaining that specific responses "were in response to specific inquiries from defendant"); 2-ER-27 (counsel for Roblox confirming that declarations were "prepared" in response to "the questions that we propounded").

Roblox seeks to take advantage of the fact that absent that context, Mr. Uhl's declarations are, admittedly, difficult to parse. Roblox asserts (at 31) that his responses to the informal questions posed by the company must be treated as if they were answers to requests for admission—and anything not explicitly denied must be deemed admitted. But requests for admission are formal discovery requests, and the Federal Rules dictate how they must be answered and when a party's response (or lack thereof) may be deemed an admission. Fed. R. Civ. P. 37(a)(4). Roblox cites no authority for the proposition that a party can be deemed to have made a binding admission simply because they did not answer an opposing party's informal questions

48

in that party's preferred manner (or even at all). If Roblox wanted Mr. Uhl to answer requests for admission or interrogatories, it could have sought them.[9] But that would have only ensured a clear record of Mr. Uhl's denial. *See* 2-ER-36. So the company seized on the opportunity to try to convince the district court to read Mr. Uhl's declarations differently than he meant them. But, as the district court explained, there is no admission to be found. 1-ER-12–14.

In arguing that the court should nevertheless have granted its motion, Roblox misunderstands the standard that applies: Motions to compel arbitration are adjudicated under a summary judgment standard. *Hansen v. LMB Mortg. Servs., Inc.*, 1 F.4th 667, 670 (9th Cir. 2021). And "summary judgment is neither a method of avoiding the necessity for proving one's case nor a clever procedural gambit whereby a claimant can shift to his adversary his burden of proof on one or more issues." *United States v. Dibble*, 429 F.2d 598, 601 (9th Cir. 1970). To compel arbitration, Roblox was required to "establish beyond controversy every essential element of its … claim." *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003). That means it had to establish that—taking the record in the light most favorable to Mr.

---

[9] Indeed, after filing its initial motion to compel arbitration, Roblox engaged in arbitration-related discovery. Roblox agreed to—and the district court therefore ordered—a process by which Mr. Uhl would supplement his declaration. And if Roblox needed more, it would go to the court. *See id.* The company chose not to do so. *See* 2-ER-33 (court emphasizing during hearing that Roblox "did not avail [itself] of the ability to conduct full discovery in order to substantiate [its] motion").

Uhl—no rational factfinder could find for Mr. Uhl on any element, including that he assented to its terms by purchasing Robux. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("[S]ummary judgment will not lie … if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."); *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co., Inc.*, 925 F.2d 1136, 1141 (9th Cir. 1991) (party opposing arbitration "on the ground that no agreement to arbitrate has been made" is entitled to "the benefit of all reasonable doubts and inferences that may arise").

Taken in the light most favorable to Mr. Uhl, his declarations support what Mr. Uhl has always said: Purchases made on his daughter's account were made by his daughter. *See supra* 9–10. At the very least, they do not demonstrate that *no* reasonable factfinder could conclude that Mr. Uhl's daughter made the purchases that, after all, were on her account. The district court, therefore, was correct to conclude that Roblox was not entitled to compel arbitration.

Roblox complains (at 30) that it satisfied its *initial* burden to put forth enough evidence that a rational factfinder *could* rule in its favor. But even if that were true, that's not enough to *win* the motion to compel. Again, to grant Roblox's motion, the district court would have to conclude that *no* reasonable factfinder—under the

"preponderance of the evidence" standard that applies here—could find that Mr. Uhl's daughter made the purchases that were on her own account.[10]

**b.** Roblox argues (at 44–47) that even if the company didn't prove that it was entitled to compel arbitration, the district court should not have denied its motion but instead held a "summary trial" to determine whether Mr. Uhl, in fact, used his daughter's account to make Robux purchases. In both cases that Roblox cites for that proposition, however, the district court was *asked* to hold a trial. *See Hansen*, 1 F.4th at 670; Defendants-Appellants' Reply Brief, No. 13-3061, *Howard v. Ferrellgas Partners, L.P.*, 2013 WL 4648273, at *27-28 (10th Cir. 2013). Here, not only did Roblox never mention a trial below, it affirmatively told the district court that it "*may* decide the motion based on the pleadings, documents of uncontested validity, and affidavits submitted by either party." 3-ER-223 (emphasis added). In other words, it told the district court that it could rule on the papers. It can't now turn around and ask this Court to reverse because the court did exactly what Roblox said it should. To the extent the court erred in not holding a trial, "the doctrine of invited error prevents

---

[10] For that reason, Roblox's reliance (at 36–39) on cases in which the plaintiff failed to identify a genuine dispute of fact have no bearing here. Not only are those cases factually inapposite as the plaintiffs there failed to recall details *about their own accounts or employment agreements*, they also don't absolve Roblox of *its* failure to meet its evidentiary burden and establish by a preponderance of the evidence that Mr. Uhl agreed to arbitrate his claims.

[Roblox] from complaining of an error that was [its] own fault." *Epic Games, Inc. v. Apple Inc.*, 161 F.4th 1162, 1177 (9th Cir. 2025).

**c.** Nor was the district court required to allow Roblox to take yet another round of discovery. *Contra* Opening Br. 44-50. Roblox waited nearly a year to move to compel arbitration, put that motion on hold to take discovery, and then filed a renewed motion. Under the discovery process that Roblox agreed to, if it was dissatisfied with Mr. Uhl's declarations, it could have asked the court for more discovery before filing its renewed motion. *See supra* 9. Instead, it chose to try to convince the court that the declarations included an admission Mr. Uhl never made. Roblox only asked for additional discovery in a footnote in its reply—and even then, only if the court would otherwise deny its motion. 2-ER-59 n.1. A discovery request raised only in a "footnote in a reply brief" is waived. *Wilson v. Huuuge, Inc.*, 944 F.3d 1212, 1220 (9th Cir. 2019).

And, in any event, Roblox had *already* been granted the opportunity to take discovery. Roblox "staked its "stratagem[]" on relying solely on Mr. Uhl's declarations and choosing not to seek more. 1-ER-16. The district court did not abuse its discretion in holding Roblox to that choice.

### 2. Mr. Uhl's daughter did not serve as his agent, let alone bind him to Roblox's terms.

Roblox halfheartedly argues that, even if Mr. Uhl did not himself make any of the purchases on his daughter's account, he is nonetheless bound to the company's

terms because his daughter was acting as his agent when *she* bought Robux. And as his agent, Roblox claims, Mr. Uhl's daughter bound him to Roblox's contract. But there's no dispute that Mr. Uhl never authorized his daughter to bind him to contracts.

Under California law, an agent must be authorized to act "*on the principal's behalf.*" *Hoffman v. Young*, 13 Cal. 5th 1257, 1274 (2022) (emphasis added). As the California Supreme Court has explained, a parent that merely grants a child permission to do something does not transform the child into an agent: The child is acting on their own behalf, not the parent's. *See id.* at 1274–75. And even if granting permission could create agency, an agent's authority is limited to "those acts the principal has intentionally delegated to the agent." *Oswald Mach. & Equip., Inc. v. Yip*, 10 Cal. App. 4th 1238, 1248 (1992); *see also Garcia v. KND Dev. 52, LLC*, 58 Cal. App. 5th 736, 747 (2020) (to bind non-party, agreement must "fall[] within the scope of authority, if any, conferred by the principal").

So Mr. Uhl's daughter could not bind him to arbitrate with Roblox unless he authorized her to enter a contract with Roblox on his behalf. *See id* at 745 (to bind a plaintiff that did not sign the agreement, the signatory must have had "authority … to execute the arbitration agreements on [the plaintiff's] behalf"); *Rogers v. Roseville*

53

*SH, LLC*, 75 Cal. App. 5th 1065, 1077 (2022) (same). Roblox points to no evidence that Mr. Uhl ever did so. It can't—there isn't any.[11]

And if Roblox's theory of assent rests on Mr. Uhl's daughter entering a contract on his behalf, its notice problem is even worse: The company does not even try to argue that a *child* purchasing Robux on its app or website would have reasonable notice that they are entering a contract, let alone binding their parent to one. *See Sellers*, 73 Cal. App. 5th at 475 ("[C]hildren … are not likely to understand that their use of a website may be governed by contractual terms, or that those terms may be included in a hyperlink[]"). Indeed, Roblox's platform fails the test even for adults.

## CONCLUSION

This Court should affirm the order denying Roblox's motion to compel arbitration.

Respectfully submitted,

*/s/ Jennifer D. Bennett*

---

[11] Roblox rests its argument (at 33) on three district court cases, none of which applies California law. Two of the cases rest on the child's apparent authority—not actual authority—a theory Roblox explicitly disclaimed below, 2-ER-48–49. *Johnson v. Activision Blizzard, Inc.*, 2025 WL 864824, at *4 (E.D. Ark. 2025); *Courtright v. Epic Games, Inc.*, 766 F. Supp. 3d 873, 904 (W.D. Mo. 2025). And the last involves a parent whose child used the *parent's* online account. *Heidbreder v. Epic Games, Inc.*, 438 F. Supp. 3d 591, 597 (E.D.N.C. 2020). Roblox cites no case under California law holding that a child has actual authority as an agent to bind a parent to a contract the parent never authorized the child to enter.

JENNIFER D. BENNETT
HANNAH M. KIESCHNICK
GUPTA WESSLER LLP
235 Montgomery Street
Suite 629
San Francisco, CA 94104
(415)-573-0336
*jennifer@guptawessler.com*

ANNE KORS*
SONALI MEHTA
GUPTA WESSLER LLP
2001 K Street NW
Suite 850 North
Washington, DC 20006
(202) 888-1741

ROBERT S. SIKO
ANDREWS & HIGGINS
4701 Von Karman Avenue
Suite 300
Newport Beach, CA 92660
949-748-1000

D. PATRICK HUYETT
ANAPOL WEISS
130 North 18th Street
Suite 1600
Philadelphia, PA 19103
(215) 608-9645

ALEXANDRA WALSH
ANAPOL WEISS
14 Ridge Square, NW
3rd Floor
Washington, DC 20016
(771) 224-8065

55

*Admitted only to California Bar; practice limited to matters before federal courts

February 3, 2026                                    *Counsel for Plaintiff-Appellant*

56

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 13,593 words excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Baskerville font.


February 3, 2026                                    */s/ Jennifer D. Bennett*
                                                     Jennifer D. Bennett